UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

BRANDON WEATHERSPOON, INDIVIDUALLY
AND AS NATURAL SON OF STEPHANIE WILLIAMS,
DECEASED, ET AL. PLAINTIFFS

VS. CIVIL ACTION NO. 3:07cv24-DPJ-LRA

NISSAN NORTH AMERICA, INC., ET AL. DEFENDANTS

## ORDER

This wrongful death products liability case is before the Court on the following three motions filed by Defendants Nissan North America, Inc., and Nissan Motor Co., Ltd. (collectively, "Nissan Defendants"): (1) Motion to Exclude the Testimony of Stephen Syson [138]; (2) Motion to Exclude the Testimony of Martha Bidez [140]; and (3) Motion for Summary Judgment [142]. The Court, having fully considered the parties' submissions and the applicable law, finds that the motions should be granted in part and denied in part, as explained below.

I. Facts/Procedural History

This case arises from a single vehicle crash that occurred on June 3, 2006, involving driver Dennis Williams and his wife, Stephanie, who was seated in the front passenger seat of their 2006 Nissan Murano. There is no dispute that Mr. Williams allowed the vehicle to leave the road, eventually causing it to roll and eject Ms. Williams. Ms. Williams died at the scene, and her sons now bring this suit against the Nissan Defendants, asserting claims for failure to warn and defective design under the Mississippi Products Liability Act (MPLA), Mississippi Code Annotated § 11-1-63; breach of warranty; and negligence.

In very general terms, Plaintiffs contend that Stephanie Williams was partially (but not fully) reclined pre-crash. During the roll, Ms. Williams began to rise up in the seat. When the

roof struck the ground, the downward compression of the roof's B-pillar (a metal pillar running along the passenger side of the roof) created enough slack in the seatbelt to allow Ms. Williams to be ejected through the right rear door, which had flown open during the roll. Plaintiffs contend that Defendants failed to warn against traveling in a partially reclined position and that the 2006 Nissan Murano was defectively designed as to the following four components: (1) the rear door latch; (2) the front passenger seat; (3) the seatbelt; and (4) the roof/B-pillar. Other defects were alleged earlier in the life of this case, but appear to have been abandoned.

The Nissan Defendants counter that Ms. Williams was fully reclined–a position against which they did warn. As such, it was her position and not the design of the seatbelt, seat, or roof that introduced the slack in the seatbelt. The Nissan Defendants further claim that this fact is undisputed in the record and represents a fatal flaw in the opinions of Plaintiffs' experts, both of whom offer opinions based on Ms. Williams having been in a partially reclined position. Defendants therefore move to strike the expert opinions and further move for summary judgment for lack of a genuine dispute of material fact. After the motions were fully briefed, the Court asked the parties to participate in an evidentiary hearing, but the parties waived that opportunity. Personal and subject matter jurisdiction exist, and the issues are ripe for decision.

II. Standards

    A. Motion for Summary Judgment

Summary judgment is warranted under Rule 56 when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

B.  Motions to Strike Expert Opinions

The Nissan Defendants move to strike two of Plaintiffs' expert witnesses, Stephen Syson and Dr. Martha Bidez. The motions, in large part, turn on the reliability of the experts' methodology rather than their credentials. Thus, the following oft-stated rules apply to the Court's gatekeeping role. To begin, "whether a proposed expert should be permitted to testify is case, and fact, specific." *Hodges v. Mack Trucks Inc*., 474 F.3d 188, 194 (5th Cir. 2006). Moreover, the district court retains "'broad latitude' both in deciding how to determine whether

an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)).

> When evaluating expert testimony, the overarching concern is whether or not it is relevant and reliable. A party seeking to introduce expert testimony must show "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting Fed. R. Evid. 702) (citation omitted). The court should "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The gatekeeper function of the district court does not, however, replace trial on the merits. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

> In performing its gatekeeper function prescribed under *Daubert*,
>
> the district court should approach its task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."

*United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Finally, "[t]he party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

4

III. Analysis

Plaintiffs contend that the subject 2006 Nissan Murano was defective with respect to the following components: (1) the right rear door latch; (2) the front passenger seat; (3) the seatbelt; (4) the roof/B-Pillar; and (5) the warnings. They therefore contend that the Nissan Defendants are liable based on claims of negligence, breach of implied warranty, and on alleged design and warning defects pursuant to the MPLA.

To prevail on a MPLA claim, Plaintiffs have the burden of proving that (1) the vehicle was defective at the time it left the control of the manufacturer or seller; (2) the defective condition rendered the product unreasonably dangerous to the consumer; and (3) the defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought. *Id.* The other claims likewise require proof of causation. *See McIntosh v. Nissan N. Am., Inc.*, No. 3:07cv60-DPJ-LRA, 2008 WL 4793743, at *4 (S.D. Miss. Oct. 28, 2008).

Defendants contend that summary judgment should be entered as to all claims because the testimony of Plaintiffs' experts Syson and Bidez should be stricken in its entirety, leaving Plaintiffs with no competent summary judgment evidence. For the reasons stated below, the Court finds that the experts' testimony should not be entirely stricken, but that certain opinions fall short of Rule 702's requirements. This order will first address the Nissan Defendants' contention that the experts' testimony should be stricken altogether.

The Nissan Defendants claim that all of Syson's and Dr. Bidez's opinions are premised on a mistaken belief that Ms. Williams's seat was only partially (not fully) reclined at the time of the crash. Syson actually offers alternative opinions in the event the seat was fully reclined; his

testimony is not, therefore, susceptible to this argument. Dr. Bidez requires a closer look. Defendants' expert Robert Gratzinger inspected the vehicle, and following de-trimming, concluded that the pre-crash position of the front passenger seat was 30 to 35 degrees *from a normal seating* position, or 48 degrees *from vertical*. Ex. M to Def.'s Mot. [140] at 6 (emphasis added). During her deposition, Dr. Bidez accepted Gratzinger's numbers, mistakenly believing them to reflect a pre-crash position of 30 to 35 degrees *from vertical*.

The record seems to support Defendants' contention that Dr. Bidez was confused when she adopted these figures, which she believed were consistent with her own. However, other evidence suggests the seat was not fully reclined, including Mr. Williams's testimony to that effect and Syson's testimony that the recliners on the two front seats were in similar pre-crash positions. Syson Dep. at 43. In addition, Dr. Bidez inspected the vehicle and conducted surrogate testing of occupant kinematics based on partially reclined and more fully reclined positions. Thus, she has conducted tests relevant to both parties' contentions. The initial seatback position aside, Dr. Bidez could still provide reliable biomechanical testimony regarding Ms. Williams's movements in the crash sequence and her injuries.

While perhaps "shaky," Dr. Bidez's testimony will be subject to cross examination as to her adoption of Gratzinger's figures and how they conflict with her own. *Daubert*, 509 U.S. at 596. "[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment." *Id*.

Having declined to strike these experts in their entirety, the Court will evaluate the admissibility of the experts' specific opinions as to each alleged defect and then evaluate

6

whether the competent record evidence is sufficient to avoid summary judgment as to each claim.

      A.      Right Rear Door

           1.      Expert Opinions

There is no dispute that the right rear door opened at some point during the accident. Why it opened is a different matter, and Plaintiffs' expert Stephen Syson testified that there is no way to tell. Syson Dep. at 47 ("I think all we can say with certainty is that the door unlatched and came open."). Syson's written report references theories regarding the door latch that he has since found inapplicable (such as the possibility of inertial forces opening the latch). This led Syson to conclude that one of two occurrences caused the door to open: either the inner door panel moved, causing the door to unlatch, or the exterior door latch caught something on the ground during a roll, causing it to open. *Id*. But Syson readily admitted, "I didn't think there was evidence that allowed for a firm decision to be made on either of those things. . . . I think it could be either." *Id*. at 47-48. When pressed as to which option was more likely, Syson testified, "I don't see anything evidentiary that allows me to say anything other than it wasn't traumatically separated. I mean, it unlatched and it unlatched due to activation of the door latch mechanism." *Id*. at 50.

During his deposition, Syson provided a fairly concise summary of his opinions as to the defects he believes caused the right rear door to open:

> So inherently, something has to unlock the door, and there's only two
> mechanisms for that that I understand, one is obviously that the solenoid
> mechanism failed to lock the door in the first place, the other is that the
> movement of the door inner panel . . . unlocked it. . . . And either way, if the
> system is designed properly, the door is not going to come open because if the
> interior handle is fixed to a rigid part of the door or a more rigid part of the door

7

> than the inner panel, it's not going to either unlatch or unlock the door; if the automatic door locks work properly, the door should be locked in the first place, and so activation of the exterior handle isn't going to open the door. So none of the ways that I can envision the door coming open would occur if the system was properly designed.

*Id.* at 159.[1]

Starting with the right rear door's exterior handle and door lock, the testimony falls well short of Rule 702's standards. For starters, the record establishes that Syson's assumption regarding automatic door locks was incorrect; the Murano was not equipped with automatic door locks. As for the lock that did exist (automatic or not), it is not enough to say the right rear door opened because the lock failed. "[U]nder Mississippi law, the mere fact of an accident or injury is not sufficient to prove a product defect." *McIntosh*, 2008 WL 4793743, at *3 (citing *Wolf v. Stanley Works*, 757 So. 2d 316, 321 (Miss. Ct. App. 2000) (affirming summary judgment where "[t]here was no effort to show a specific defect in the design of the sensor, but reliance was placed solely on the evidence that the door shut prematurely")).

Here, Syson does not appear to have tested or otherwise addressed whether the right rear door was even locked. Syson Dep. at 50. If it was locked, then why did it fail? Syson generically claims that the lock was defectively designed, but he fails to explain how. He does speculate at one point that perhaps the solenoid somehow failed, but he neglects to explain why he thinks that might be the case. Assuming it was the solenoid, was it a design or manufacturing defect? If it was a design issue, then what was the defect and where is the alternative design? If a manufacturing issue, then how did the lock deviate from the manufacturer's specifications or

---

[1]Syson also stated that the handle should be sufficiently "flush" to avoid catching the ground, but given the facts of this case, he could not conclude that it constituted a defect. *Id.* at 193.

8

from otherwise identical units manufactured to the same manufacturing specifications? If it was not the solenoid, then how was the lock otherwise defective? None of these questions are tested or answered, and no methodology is apparent.

For these reasons, Plaintiffs failed in their burden of establishing the admissibility of the external latch/lock opinions as to the right rear door. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Syson has not supported his theory regarding the existence of a product defect as required by Section 11-1-63(a)(i)(3), or that the defective condition of the latch/locks proximately caused external activation, as required by Section 11-1-63(a)(iii). Syson likewise failed to offer sufficiently reliable proof of a feasible design alternative for the right rear door latch/lock that "would have to a reasonable probability prevented [Williams's injury] without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63(f)(ii). While Syson did mention certain other latch designs, he did so in the most generic fashion and otherwise discounted those alternatives in his deposition. *See Williams v. Bennett*, 921 So. 2d 1269, 1275 (Miss. 2006) ("It follows that the mere mention of a design alternative by an expert comes well-short of lending evidentiary guidance to a court.").

The insufficiency of Syson's opinion regarding the right rear door's external latch/lock is fatal to his opinion that the latch was insufficiently anchored in the inner panel. Even assuming the reliability of his opinion that the interior door panel was defectively designed, he still must show causation under Section 11-1-63(a)(iii), which he cannot do because he does not know whether the alleged defect in the panel or the latch actually caused the door to open. In sum, the

9

speculative testimony regarding the right rear door fails all three essential Rule 702 tests and looks similar in nature to the rejected testimony in *Kumho Tire*. Syson's opinions regarding alleged defects in the right rear door will be stricken.

Likewise, Dr. Bidez offers her opinion that the door was defective because it should not have opened. Again, such opinions are speculative, incomplete, and not helpful for the jury under Rule 702. The mere fact of accident is not sufficient to prove a defect under Mississippi law. *McIntosh*, 2008 WL 4793743, at *3. Dr. Bidez's testimony regarding the right rear door is also stricken.

2.   Motion for Summary Judgment

Plaintiffs have the burden of proving that the alleged defect existed and proximately caused the injury. Miss. Code Ann. § 11-1-63(a)(iii); *see also Williams*, 921 So. 2d at 1274 (holding that plaintiff must prove that the defect "proximately caused the injury"); *Moore ex rel. Moore v. Miss. Valley Gas Co.*, 863 So. 2d 43, 46 (Miss. 2003) ("[I]t is incumbent upon the plaintiff in any products liability action to show that the defendant's product was the cause of the plaintiff's injuries.").

In response to the motion for summary judgment as to the right rear door claim, Plaintiffs rely on their experts. Because those opinions are not competent and have been stricken, there is no record evidence of a defect in the right rear door that proximately caused Ms. Williams's injuries and no evidence of a feasible design alternative that "would have to a reasonable probability prevented [Ms. Williams's injury], without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63(f)(ii). As such, Defendants' Rule 56 motion is granted as to claims related to the right

rear door. *See Goodyear Tire & Rubber Co.*, 495 F.3d at 228 (affirming summary judgment under Section 11-1-63 where plaintiff's causation expert was stricken under Rule 702).

B. Front Passenger Seat/Seat Belts

1. Expert Opinions

Mr. Syson initially offered a number of opinions regarding the pre-crash position of the seat and the design of the seat. After writing his report, Syson testified that the B-pillar in the roof pushed the seat from a position that was slightly beyond a partially reclined position to the more fully reclined position it ultimately took. This eliminated his prior theory that occupant loading caused the deformation. *See* Syson Dep. at 44-45. That conclusion nullified Syson's earlier opinion that the seat was not sufficiently sturdy to withstand foreseeable forces and mooted his opinions regarding alternative designs in this regard. *Id*. at 45-46. Plaintiffs do not seriously contend that these initial opinions regarding occupant loading are still relevant, and they are stricken.

Syson's opinions regarding alternative designs for seats that automatically return to vertical upon emergency braking and other interlocks and/or functional tie-ins are also insufficient. These concepts were not well developed or supported and appear speculative and conceptual in nature. *See Williams*, 921 So. 2d at 1275 ("It follows that the mere mention of a design alternative by an expert comes well-short of lending evidentiary guidance to a court.").[2]

However, Syson offered other opinions regarding the seat and belt that were not rendered irrelevant by his ultimate opinion that the B-pillar caused the deformation of the seatback. For

---

[2]Syson also discussed several additional warning mechanisms as an alternative design. These are addressed below.

11

example, Syson opined that the design of the belting mechanism was insufficient for someone in a reclined position because the passenger could slide under the belt in a rear-end collision. The experts agree that the rear of the vehicle made the first significant impact during the roll and thus simulated a rear end collision. They further seem to agree that Ms. Williams slid under the belt. Syson's testimony in this regard is sufficiently reliable to present the existence of this alleged defect to the jury.

Syson also identifies several potential design alternatives that are sufficiently supported to present to the jury. First, he opined that the degree of reclination could be limited as with Ford products. Second, he advocated all-belts-to-seats (ABTS), which anchor the belt to the seat frame, providing greater restraint when the passenger is reclined. Defendants argue that these designs are not supported, but the Court concludes that those arguments go to weight and the opinions survive Rule 702. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

      2.     Summary Judgment

To the extent Syson's testimony regarding the alleged defect with the seats/belts is admissible, it is sufficient to create a question of fact as to each essential element of the claim. Defendants' motion for summary judgment is therefore denied as to this portion of Plaintiffs' suit.

    C.     Roof/B-Pillar

      1.     Expert Opinions

Plaintiffs claim that the roof of the vehicle was defective. Their theory is that the B-pillar collapsed downward at some point during the rollover, which introduced enough slack into the seatbelt to allow full ejection. Plaintiffs support this contention with the testimony of biomechanical engineer Dr. Bidez, who performed a visual examination and conducted surrogate testing. The problem with this particular theory is its failure to account for the timing of the deformation.

According to Defendants' expert, the B-pillar was not significantly deformed until after Ms. Williams was ejected. The Nissan Defendants theorize that whatever slack may have been introduced by deformation was not therefore a proximate cause of the ejection. Dr. Bidez lacks sufficient qualifications or basis under Rule 702 to opine as to the timing of the deformation during the crash sequence. Plaintiffs' mechanical engineer, Stephen Syson, agreed in his deposition that there is no quantitative analysis showing significant deformation of the B-pillar before ejection. Syson Dep. at 85, 135. Accordingly, there is no reliable basis for opining that the B-pillar collapse created slack in the belt and caused the ejection. Any such opinions are stricken under Rule 702.

2. Summary Judgment

Plaintiffs no longer have expert testimony to support their theory that roof deformation created slack that allowed ejection. That claim is therefore dismissed. *See Goodyear Tire & Rubber Co.*, 495 F.3d at 228. In addition, Plaintiffs' own experts demonstrate why the roof deformation/slack theory is not causally related to Ms. Williams's injuries. Plaintiffs have a burden under Rule 56 of demonstrating a triable issue as to each essential element of their claim. "[I]t is incumbent upon the plaintiff in any products liability action to show that the defendant's

13

product was the cause of the plaintiff's injuries." *Moore ex rel. Moore*, 863 So. 2d at 46 (Miss. 2003). Causation requires proof "which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." *Herrington v. Leaf River Forest Prods., Inc.*, 733 So. 2d 774, 777 (Miss. 1999).

Here, Dr. Bidez testified that Ms. Williams was first partially ejected to the point where her torso had cleared the top of the seat, but her feet snagged the belt preventing full ejection. She explained: "[S]o, the pillar was collapsing down while her legs and feet were still hooking the lap belt pooling out." Bidez Dep. at 57. Dr. Bidez continued:

> There is no question she did not immediately clear the vehicle. She is being hung up while the vehicle was continuing to roll, based on the evidence on the lap belt. So at a minimum there has to be at least one ground slap if the vehicle didn't roll completely over her. Then after that she could either be hurled or go through -- depending on which reconstruction you take -- additional ground impact before being released into her final rest position.

*Id*. at 57-58. In other words, Dr. Bidez believes that while the B-pillar collapse allowed full ejection, Ms. Williams was already partially outside the vehicle, being either crushed or slapped against the ground in a high-speed roll; the pre-roll speed has been estimated as high as 90 miles per hour. Dr. Bidez summarized her point as follows:

> [J]ust to make sure the record is complete, with my opinion the timing of when the roof collapsed is, in fact, what dictates at what point Ms. Williams is completely ejected from the vehicle. If, in fact, Dr. Wooley is correct, that the roof crush does not occur until the very end, then we have the unfortunate situation of Ms. Williams hanging outside the vehicle and being slapped on the ground at least three or four times before she is released.

*Id.* at 59.

As for Syson, he agreed that the deformation of the roof was not causally related to Ms. Williams's injuries:

> Q. Now, given the conclusion that the significant roof deformation occurred on the final halfroll after decedent was already ejected out of the vehicle, do you agree that there is no causal relationship between any identified roof strength defect and Mrs. Williams injuries?
>
> A. As I say, barring any additional information, I would have to agree with that.

Syson's Dep. at 85; *see also id.* at 112-113 (agreeing that "there's no causal link between the roof structure design in this vehicle and injuries that the decedent sustained").

Given these opinions, no reasonable juror could conclude that the slack produced from the roof deformation proximately caused or exacerbated Ms. Williams's injuries. The Nissan Defendants are entitled to summary judgment of the claim that a defectively designed roof allowed deformation and resultant slack in the belt.

D. Warnings

1. Expert Opinions

Plaintiffs claim that the following warning in the 2006 Nissan Murano owner's manual was inadequate:

> Do not ride in a moving vehicle when the seatback is reclined. This can be dangerous. The shoulder belt will not be against your body. In an accident, you could be thrown into it and receive neck or other serious injuries. You could also slide under the lap belt and receive serious internal injuries.
>
> For the most effective protection when the vehicle is in motion, the seat should be upright. Always sit well back in the seat and adjust the seat belt properly. See "Precautions on seat belt usage" later in this section.

Ex. N to Def.'s Mot. [142]. The warning also included the following depiction:


*Id.*

Under the MPLA, a product can be defective if "it fail[s] to contain adequate warnings or instructions." Miss. Code Ann. § 11-1-63(a)(i)(2). The MPLA defines adequate warnings as follows:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product.

Miss. Code Ann. § 11-1-63(c)(ii).

Plaintiffs support their warnings claim in part through the testimony of Bidez and Syson, but some of those opinions fall short of Rule 702's requirements. For example, Dr. Bidez is a biomechanical engineer, and Plaintiffs failed to respond to Defendants' contention that she is not a qualified warnings expert. She is not. Moreover, her purported testimony regarding the warning is quite limited, opining merely that the seat was not in the same position as depicted in the illustrations. Expert testimony must assist the trier of fact and "concern matters beyond the understanding of the average person." *Bridges v. Enter. Prods. Co.*, No. 3:05cv786-WHB-LRA,

2007 WL 465738, at *3 (S.D. Miss. Feb. 8, 2007). After determining the pre-crash position, the average person is perfectly capable of determining whether it was reflected in the illustration. Dr. Bidez's testimony regarding warnings is stricken.

Syson offers similarly unhelpful and unreliable testimony. First, Syson did not appear to know what the actual warning looked like and offered what appeared to be unsupported speculation with respect to the impact of the warning's text. This portion of the testimony fails all three of the Rule 702 requirements and should be stricken. Second, Syson's conclusion that the language is vague is not helpful. The precise legal question is whether the warning is adequate based on "the ordinary knowledge common to an ordinary consumer who purchases the product." Miss. Code Ann. § 11-1-63(c)(ii). Again, the average juror is capable of determining whether the text was vague. While properly supported expert testimony might be admissible on the impact of various text, Syson has not offered any form of testing or other data as to this specific language that would assist the jury. *Cf. Lloyd v. John Deere Co.*, 922 F.2d 1192, 1196 n.3 (5th Cir. 1991) (noting district court's exclusion of proffered expert testimony that warning was not present because the issue did not require specialized knowledge as contemplated by Rule 702).

Syson does offer other opinions that will be allowed. For example, Syson considered the alternative hypotheses that Ms. Williams was fully reclined. He cites historical data for the proposition that traveling in such a position is a well-known hazard within the automobile industry. This testimony is reliable under Rule 702 because Syson possesses sufficiently reliable knowledge of historical research and other industry data regarding seat position warnings. The opinions would assist the jury, provided that they surpass the *Daubert* "fit" requirement.

*Daubert*, 509 U.S. at 591-92. Accordingly, testimony regarding historical research, data, and testing of substantially similar warnings will be allowed.

In addition, Syson opines that the warning should not have been relegated to the owner's manual and should have appeared in the compartment. The Court finds that this testimony is sufficiently reliable under Rule 702. Defendants' disagreement with Syson's views goes to weight and is best tested in an adversarial setting.

2. Summary Judgment

Defendants' primary argument in support of their motion for summary judgment of the warnings claim is that Ms. Williams was fully reclined as depicted in the second image above. By this argument, as a matter of law, the warning was sufficient. However, Defendants' argument would require an impermissible weighing of the evidence. While the Nissan Defendants favor their expert's conclusion, Mr. Williams's testimony that his wife was not fully reclined is admissible and would alone create a question of fact as to the pre-crash position of the passenger seat. This in turn creates a jury question as to whether the warning was adequate because her position (according to Plaintiffs) fell somewhere between the two depicted positions. This testimony, coupled with Syson's opinions, creates a genuine issue of material fact.[3]

---

[3] Even without Syson, the issue would remain. Defendants cite *Wyeth Laboratories, Inc. v. Fortenberry*, 530 So. 2d 688 (Miss. 1988), for the proposition that expert testimony is required to establish a claim under Section 11-1-63(c)(ii). However, Mississippi does not appear to have addressed the issue in this context, and *Fortenberry* strongly suggests that there is no categorical rule. According to the Supreme Court, "[e]xpert testimony *may* be necessary to assist the trier of fact to understand the evidence or determine a fact in issue when the issue presented requires scientific, technical or other specialized knowledge." *Fortenberry*, 530 So. 2d at 692 (emphasis added). The court further explained that "[w]here the adequacy of the warning is not obvious to the ordinary layperson it is necessary to have expert testimony as to this issue." *Id.* *Fortenberry* involved a pharmaceutical warning under the learned intermediary doctrine, and thus examined whether a drug warning was sufficient to warn a doctor. *Id.* The court noted that

18

Finally, Defendants also argue that Plaintiffs offered no feasible alternatives. But Section 11-1-63 creates no such burden. *See* Miss. Code Ann. § 11-1-63(f)(ii) (requiring alternative design only for design defect claims). "The issue of a warning's adequacy is factual and usually will be resolved by the trier of fact." *Fortenberry*, 530 So. 2d at 692. Here, Plaintiffs' warning claim survives Defendants' Rule 56 motion.

IV.    Conclusion

The record supporting the pending motions was voluminous, and the reports and testimony from the experts included a number of subjects and statements that were either ignored or superficially addressed in the memoranda. This Order sets the parameters for the expert testimony, but the Court is well aware that some additional fine-tuning may be required. Given the nature of the issues, the parties are ordered to confer in an effort to define the proper scope of expert testimony in light of this order and inform the Court if differences remain.

For the reasons stated above, Defendants' Motion to Exclude the Testimony of Stephen Syson [138], Motion to Exclude the Testimony of Martha Bidez [140], and Motion for Summary Judgment [142] are granted in part and denied in part.

Finally, the parties are ordered to contact the Courtroom Deputy to set the case for pretrial conference and trial.

---

"[t]he terms and applications of a warning on such a drug, in order to have meaning, must be explained to the jury. This is a subject so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Id*. (citations and quotation marks omitted). Not every element of a Section 11-1-63 claim requires expert testimony. *See Forbes v. Gen. Motors Corp*., 935 So. 2d 869, 877-78 (Miss. 2006). These are case-by-case determinations. The adequacy of the subject warning does not require expert testimony.

19

**SO ORDERED AND ADJUDGED** this the 17th day of February, 2010.

                                              s/ *Daniel P. Jordan III*
                                              UNITED STATES DISTRICT JUDGE